IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

CLERKS OFFICE US DISTRICT COURT
AT HARRISONBURG, VA
FILED

07/16/2026

LAURA A. AUSTIN, CLERK
BY: **/s/ Amy Fansler**
DEPUTY CLERK

| | | |
|---|---|---|
| Feds for Freedom, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 5:25-cv-00079 |
| | ) | |
| Meta Platforms, Inc., | ) | |
| | ) | |
| Defendant. | ) | |

## **MEMORANDUM OPINION**

Plaintiff Feds for Freedom is an advocacy group against COVID-19 vaccine mandates.

It alleges that Defendant Meta Platform, Inc. ("Meta") defamed the organization by warning

Instagram users that its posts contained "false information."

This matter is before the court on Meta's motion to transfer, or, in the alternative, to

dismiss this action.  (Dkt. 15.)  Because Feds for Freedom agreed to a valid forum selection

clause in Instagram's Terms of Use, the court will transfer this action.

### I.    Background[1]

Feds for Freedom is a Nevada nonprofit organization with over 9,500 members.  (Am.

Compl. ¶ 1 (Dkt. 14).)  It was founded to advocate against "legal abuses" stemming from

COVID-19 vaccine mandates, a mission it advances by posting content on social media

platforms.  (*See id.* ¶¶ 4–5.)  One such social media platform is Instagram, a subsidiary of Meta.

---

[1] The following facts are taken from Feds for Freedom's amended complaint, as well as from exhibits and declarations attached to Meta's briefing.  *Newbauer v. Jackson Hewitt Tax Serv. Inc.*, No. 2:18CV679, 2019 WL 1398172, at *3 (E.D. Va. Mar. 28, 2019) (noting that "in deciding a motion to transfer," courts "may consider evidence outside the pleadings, including affidavits and declarations").

(*Id.* ¶¶ 6–7.)  Feds for Freedom created an Instagram account at an unspecified date.  (*Id.* ¶¶ 6–8.)  When signing up for its account, Feds for Freedom "did not review any terms of use" from Meta.  (*Id.* ¶ 9.)  According to the plaintiff, Meta did not "post its terms of use explicitly," (*id.* ¶ 10), but "hid the terms of use behind a hyperlink," (*id.* ¶ 11).

After signing up, Feds for Freedom frequently posted on Instagram.  (*Id.* ¶ 12.)  But on July 13, 2023, when users tried to "re-post" content from Feds for Freedom, they encountered the following message: "This account has repeatedly posted false information that was reviewed by independent fact checkers or went against our Community Guidelines. Do you want to @mention this account?"  (*Id.* ¶¶ 13–15.)  Instagram then prompted users to either "Cancel," which appeared "in bold blue letters," or "@mention anyway," which appeared "in regular font."  (*Id.* ¶ 16.)  Instagram users located in Virginia, Arizona, and other locations in the United States received such messages.  (*Id.* ¶ 17.)  Feds for Freedom alleges that this warning was active nationwide.  (*Id.* ¶ 26.)

Feds for Freedom alleges it did not post false information.  (*Id.* ¶ 20–21.)  According to the plaintiff, Meta either knew this statement to be false or recklessly disregarded its falsity. (*Id.* ¶¶ 22–23.)  Feds for Freedom also maintains that its posts did not violate Instagram's Community Guidelines and that Meta did not consult fact-checkers in evaluating the organization's posts.  (*Id.* ¶¶ 24–25.)  Feds for Freedom claims that Meta's warnings caused it "reputational harm."  (*Id.* ¶ 18.)

Feds for Freedom initiated this case in Warren County Circuit Court.  (Dkt. 1.)  Meta removed to this court shortly thereafter.  (*Id.*)  A week later, Meta moved to transfer the case

to the Northern District of California, or, in the alternative, to dismiss the case.  (Dkt. 6.)  Feds for Freedom subsequently filed an amended complaint, (Dkt. 14).  Meta again moved to transfer or, in the alternative, to dismiss the amended complaint.  (Dkt. 15.)

In its motion, Meta argues that Feds for Freedom agreed to Instagram's Terms of Use when the organization created its Instagram account.  (Def.'s Br. at 2 (Dkt. 16).)  At all relevant times, Instagram's Terms of Use contained a forum selection clause requiring "that [any claim] will be resolved exclusively in the U.S. District Court for the Northern District of California or a state court located in San Mateo County."  (Dkt. 17-2 at 6.)

## II.    Standard of Review

28 U.S.C. § 1404(a) allows a district court to transfer a case to another district.  *Atl. Marine Constr. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.*, 571 U.S. 49, 59 (2013).  Section 1404(a) states that "[f]or the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented."  28 U.S.C. § 1404(a).  In deciding whether to transfer venue, the traditional § 1404(a) framework requires the court to consider "(1) the weight accorded to plaintiff's choice of venue; (2) witness convenience and access; (3) convenience of the parties; and (4) the interest of justice."  *Trs. of Plumbers & Pipefitters Nat'l Pension Fund v. Plumbing Servs., Inc.*, 791 F.3d 436, 444 (4th Cir. 2015).

"The calculus changes, however, when the parties' contract contains a valid forum-selection clause, which 'represents the parties' agreement as to the most proper forum.'"  *Atl. Marine*, 571 U.S. at 63 (quoting *Stewart Org. v. Ricoh Corp.*, 487 U.S. 22, 31 (1988)).  The

"presence of a valid forum-selection clause requires district courts to adjust their usual § 1404(a) analysis in three ways." *Id.* First, "the plaintiff's choice of forum merits no weight." *Id..* Second, the court "should not consider arguments about the parties' private interests," but "may consider arguments about public-interest factors only." *Id.* at 64. Public-interest factors "include the administrative difficulties flowing from court congestion; the local interest in having localized controversies decided at home; [and] the interest in having the trial of a diversity case in a forum that is at home with the law." *Id.* at 62 n.6 (cleaned up). And third, "when a party bound by a forum-selection clause flouts its contractual obligation and files suit in a different forum, a § 1404(a) transfer of venue will not carry with it the original venue's choice-of-law rules—a factor that in some circumstances may affect public-interest considerations." *Id.* at 64.

The U.S. Supreme Court has instructed that a "valid forum-selection clause [should be] given controlling weight in all but the most exceptional cases." *Id.* at 63 (quoting *Stewart*, 487 U.S. at 33 (Kennedy, J., concurring) (alteration in original); *see also BAE Sys. Tech. Sol. & Servs., Inc. v. Republic of Korea's Def. Acquisition Program Admin.*, 884 F.3d 463, 470 (4th Cir. 2018) ("As a general matter, courts enforce forum selection clauses unless it would be unreasonable to do so.").

"[I]n deciding a motion to transfer," unlike in a motion to dismiss under Rule 12(b)(6), courts "may consider evidence outside the pleadings, including affidavits and declarations." *Newbauer v. Jackson Hewitt Tax Serv. Inc.*, No. 2:18CV679, 2019 WL 1398172, at *3 (E.D. Va.

- 4 -

Mar. 28, 2019) (citing *W. Ref. Yorktown, Inc. v. BP Corp. N. Am. Inc.*, 618 F. Supp. 2d 513, 516 (E.D. Va. 2009)).

### III.    Analysis

Feds for Freedom argues that it is not bound by the forum selection clause because Instagram's Terms of Use "constitute an unenforceable browsewrap agreement." (Pl.'s Resp. at 2 (Dkt. 21).) But for the reasons explained below, Feds for Freedom entered an enforceable agreement when it signed up for Instagram.[2] Accordingly, the plaintiff is bound by the forum selection clause in Instagram's Terms of Use.

### A. Instagram's Terms of Use was not an unenforceable "browsewrap" agreement.

Browsewrap agreements are web-based contracts that do "not require a user to click a box or button indicating that he or she agrees to certain terms to use the website." *Trimble v. Entrata, Inc.*, 791 F. Supp. 3d 615, 628 (D. Md. 2025). "A defining feature of a browsewrap agreement is that it does not require a user to manifest assent to the terms and conditions expressly" such as by "sign[ing] a document or click[ing] on an 'accept' or 'I agree' button." *AvePoint, Inc. v. Power Tools, Inc.*, 981 F. Supp. 2d 496, 510 (W.D. Va. 2013) (cleaned up). Instead, browsewrap agreements "attempt[] to bind the user to hyperlinked terms simply through using the website." *Trimble*, 791 F. Supp. 3d at 628.

---

[2] The parties have not briefed the court on whether California or Virginia contract law controls the formation of this contract. But the court will not resolve that question here. "The parties flag no relevant differences between California and [Virginia] contract law that bear on the issues" of contract formation. *Dhruva v. CuriosityStream, Inc.*, 131 F.4th 146, 151 n.1 (4th Cir. 2025). "And where, as here, the answer 'makes no discernable difference to the relevant analysis,' this Court 'need not resolve [a] choice-of-law question.'" *Id.* (quoting *World Fuel Servs. Trading, DMCC v. Hebei Prince Shipping Co.*, 783 F.3d 507, 514 (4th Cir. 2015)).

By contrast, "[a] clickwrap agreement is a dialogue box that appears on a webpage and requires that a user agree to certain terms before allowing the user to continue the website." *Hosseini v. Upstart Network, Inc.*, No. 19-CV-704, 2020 WL 573126, at *4 (E.D. Va. Feb. 5, 2020). "Courts generally have looked more favorably upon clickwrap and sign-in-wrap agreements than browsewrap agreements," *Melo v. Zumper, Inc.*, 439 F. Supp. 3d 683, 696 n.8 (E.D. Va. 2020), although the enforcement of any agreement is "a fact-intensive inquiry," *Marshall v. Georgetown Mem'l Hosp.*, 112 F.4th 211, 219 n.6 (4th Cir. 2024) (cleaned up). Even "[m]odified or hybrid clickwrap agreements, where the user must affirmatively manifest assent to agreements that are provided via hyperlink, are . . . routinely found to be valid, enforceable contracts." *Hosseini*, 2020 WL 573126, at *4.

The court finds that Feds for Freedom entered an enforceable contract here. When Feds for Freedom signed up for Instagram, Meta explicitly informed it that "[b]y tapping 'Sign Up' [] you agree to our Terms, Data Policy, and Cookies Policy." (Muth Decl. ¶ 5(b) (Dkt. 23-1).)[3] This is a far cry from an unenforceable browsewrap agreement where the party "gives

---

[3] Meta submitted a sworn declaration describing Instagram's sign-up flow and stating that Instagram's registration page as of October 6, 2021—the date that Meta attests Feds for Freedom signed up for an account—displayed a hyperlink to Instagram's Terms of Use when users signed up for an account. (Muth Decl. ¶ 5(b).) Again, courts "may consider evidence outside the pleadings, including affidavits and declarations" in ruling on a motion to transfer. *Newbauer*, 2019 WL 1398172, at *3 (citing *W. Ref. Yorktown, Inc.*, 618 F. Supp. 2d at 516). The court will credit the facts contained in this declaration for purposes of this motion, given the declarant's personal knowledge of the information described therein, *see Melo v. Zumper, Inc.*, 439 F. Supp. 3d 683, 694 (E.D. Va. 2020) (collecting cases noting that courts "regularly and properly" rely on declarations to determine what "would have appeared" on users' screens when entering into web-based contracts)—and given that Feds for Freedom's allegations are consistent with the declaration, (Am. Compl. ¶ 11 (stating only that "Instagram / Meta hid the terms of use behind a hyperlink."); Pl.'s Resp. at 2 (noting when discussing the process for singing up for an account on Instagram that the Terms of Use "exist behind a hyperlink that the user must click to review.")). Because the court may consider these documents in ruling on the motion to transfer, the court need not analyze Meta's request to take judicial notice. (Dkt. 17). Judicial notice would only be necessary if the court decided Meta's 12(b)(6) motion to dismiss (which it does not), because the court cannot consider matters outside the pleadings in resolving the motion to dismiss without converting it to the motion for summary judgment. *See Occupy Columbia v. Haley*, 738 F.3d 107, 116 (4th Cir. 2013).

his assent" simply "by using the website" without any affirmative act. *AvePoint, Inc.*, 981 F. Supp. 2d at 510. This is more like a hybrid clickwrap agreement which courts have routinely held to be valid. *Melo*, 439 F. Supp. 3d at 699 (noting that clicking a button to create an account "manifested assent" to terms of use when the website "clearly stated that '[b]y creating [an] Account you indicate your acceptance of our Terms and Conditions'"); *see also Payne v. Amazon.com, Inc.*, No. 2:17-cv-2313, 2018 WL 4489275, at *5 (D.S.C. July 25, 2018) ("[A] reasonably prudent offeree would know that he agreed to Amazon's Conditions of Use by clicking the 'Place your order' button when that button appeared directly next to or above a statement hyperlinking to conditions and the statement indicated the user agreed to those conditions by ordering.").

Feds for Freedom's arguments to the contrary are unavailing. Feds for Freedom argues that this case "tracks almost exactly" to *Watkins v. Carr*, in which the court refused to enforce a browsewrap agreement. (Pl.'s Resp. at 4 (citing No. CV PX-17-0819, 2018 WL 10741730 (D. Md. Jan. 12, 2018)).) But *Watkins* is inapposite. There, the party seeking to enforce the ostensible browsewrap agreement did "not demonstrate[] how Plaintiff, or any . . . user, would have been on notice of its terms of use." *Watkins*, 2018 WL 10741730, at *4. In other words, *Watkins* involved a classic browsewrap agreement that attempted to bind users "simply through using the website" without any indicia of mutual assent. *Melo*, 439 F. Supp. 3d at 696 n.8. By contrast, Meta conspicuously told users that by clicking "Sign Up," they were agreeing to its hyperlinked Terms of Use. (Muth Decl. ¶ 5(b).) In such circumstances, Feds for Freedom manifested assent to Instagram's Terms of Use when it signed up for Instagram.

*Payne*, 2018 WL 4489275, at *5 (collecting cases holding that when a user clicks a "sign up" button directly hyperlinked terms, the user assents to those terms).

**B. Feds for Freedom's failure to read the Terms of Use does not render the contract unenforceable.**

Next, Feds for Freedom seemingly argues that because it did not read Instagram's hyperlinked Terms of Use, it cannot be bound by them.  (Pl.'s Resp. at 4.)  But as the Fourth Circuit has noted, generally, "when a website provides clear and reasonably conspicuous notice that there are contract terms available by scrolling down or *clicking a hyperlink*, the user is on reasonable notice of those terms *even if she never reads them*."  *Dhruva v. CuriosityStream, Inc.*, 131 F.4th 146, 153 (4th Cir. 2025) (emphases added) (cleaned up); *see also Melo*, 439 F. Supp. 3d at 697 ("As long as the hyperlinked text was itself reasonably conspicuous . . . a reasonably prudent smartphone user would have constructive notice of the terms." (quoting *Meyer v. Uber Technologies, Inc.*, 868 F.3d 66, 79 (2d Cir. 2017))).

Here, Instagram's Terms of Use were conspicuous to users registering for an account. A link to the terms was bolded and hyperlinked on Instagram's sign-up screen.  (Muth Decl. ¶ 5(b).)  If clicked, this bolded hyperlink led directly to the then-effective Terms of Use.  (*Id.*) In other words, Feds for Freedom had clear notice—or, at least, constructive notice—of the terms to which it was agreeing by signing up for Instagram.  Feds for Freedom's "[f]ailure to read an enforceable online agreement, as with any binding contract, will not excuse compliance with its terms."  *CoStar Realty Info., Inc. v. Field,* 612 F. Supp. 2d 660, 669 (D. Md. 2009) (cleaned up).

**C. The court must transfer this case to the Northern District of California.**

Now that the court has found that the parties entered into a valid contract containing a forum selection clause, the court proceeds with the analysis outlined in *Atlantic Marine*. Again, a "valid forum-selection clause [should be] given controlling weight in all but the most exceptional cases." *Atl. Marine*, 571 U.S. at 63 (quoting *Stewart*, 487 U.S. at 33 (Kennedy, J., concurring) (alteration in original). But Feds for Freedom has offered *no* argument that any of the public-interest factors (court congestion, localized interests, or familiarity with governing law) weigh against transfer—much less that these factors "overwhelmingly disfavor a transfer." *Id.* at 67.

Nor has the court identified any such public-interest factors on its own review. At first glance, "familiarity with governing law" could counsel keeping this case in Virginia, since the plaintiff asserts a defamation claim under Virginia law. But Meta has explained that—due to the California choice of law provision in Instagram's Terms of Use—Virginia law may not apply to this action at all. (Def.'s Br. at 10.) Meta also asserts that a limitation of liability clause bars Feds for Freedom's damages under California law. (*Id.* at 10–11.) A California court is better suited to deal with these questions.

This case also satisfies other prerequisites for transferring. The parties do not contest that the forum selection clause—which states that claims relating to use of Instagram "will be resolved exclusively" in California, (Dkt. 17-2 at 6)—is "mandatory." *TECH USA, Inc. v. Evans*, 592 F. Supp. 2d 852, 856 (D. Md. 2009) ("Only mandatory forum-selection clauses are enforced . . . . A mandatory forum-selection clause is one containing clear language showing

that jurisdiction is appropriate only in the designated forum." (cleaned up)).  Nor do the parties

contest that the forum selection clause encompasses Feds for Freedom's claims against Meta

in this suit.  Transfer is thus appropriate.  Because the court will grant Meta's motion to

transfer, it does not reach the arguments presented in its motion to dismiss.

## IV.    Conclusion

For these reasons, the court will transfer this matter to the Northern District of

California.

An appropriate Order will issue.

**ENTERED** this 16th day of July, 2026.

HON. JASMINE H. YOON
UNITED STATES DISTRICT JUDGE